S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**PAMALA R. HOLSINGER, OSB #89263**
Assistant United States Attorney
pamala.holsinger@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:11-CR-102-01-JO |
| v. | |
| JARED DANIEL RILEY, | GOVERNMENT'S SENTENCING MEMORANDUM |
| Defendant. | Sentencing Date:  September 5, 2013 |

The United States of America, by S. Amanda Marshall, United States Attorney for the District of Oregon, and through Pamala R. Holsinger, Assistant United States Attorney, respectfully submits this memorandum for defendant's sentencing, which is currently set for Thursday, September 5, 2013, at 11:00 a.m.

The government agrees with the Presentence Writer that the total offense level would be 33 (34 based on drug quantity, plus 2 for role in the offense, minus 3 for acceptance of responsibility), the defendant's criminal history category is IV, and the resulting guideline range is 188 to 235 months.  For the reasons set forth below, the government is seeking a sentence in the middle of the advisory guideline range—211 months.

**Procedural Background**

On March 2, 2011, the federal grand jury returned a 12-count indictment charging defendant and two others with conspiracy to distribute and possess with intent to distribute oxycodone, possession with intent to distribute oxycodone, and attempting to obtain oxycodone by fraud and misrepresentation. The indictment was sealed to allow the ongoing investigation in Arizona to continue. On April 5, 2012, defendant made his first appearance in the District of Oregon on a writ *ad prosequendum*. Defendant was serving a 24-month prison sentence in the State of Nevada for robbery and assault with a deadly weapon. On March 1, 2013, defendant entered a guilty plea pursuant to a plea agreement to Counts 1, 2, and 8 of the indictment. The plea agreement resolved potential charges against defendant in the District of Oregon and the District of Arizona arising out of the conspiracy.

Codefendant Joselle Bautista has transferred her case to the District of Arizona pursuant to Rule 20 of the Federal Rules of Criminal Procedure. Codefendant Elyzabeth Leitner has entered a plea of guilty and is pending sentencing currently scheduled for November 18, 2013. As detailed in the PSR, one other indictment involving this same conspiracy is pending before this Court. The PSR correctly identifies the 14 charged individuals whom defendant conspired with and who have been charged in the District of Arizona or the District of Oregon. To date no defendant has been sentenced in the District of Oregon or the District of Arizona (PSR ¶¶ 9 through 22).

**Factual Background**

The government concurs with the description of the Offense Conduct described in paragraphs 23 through 33 of the Presentence Report. Specifically, from at least March 2010 to

March 2011 in the Districts of Oregon, Arizona and elsewhere, defendant agreed and conspired with Elyzabeth Leitner, Joselle Kate Bautista, and others to distribute and possess with intent to distribute oxycodone. (PSR ¶ 23.)  This case involves a large oxycodone prescription drug distribution network that fanned out across the United States.  The drug distribution network was based in Arizona and involved creating forged prescriptions for oxycodone and using false identities when filling them at various pharmacies throughout the United States.  The object of the conspiracy, like all drug conspiracies, was to obtain large quantities of oxycodone that other coconspirators and the defendant would later sell for profit.  (PSR ¶ 23.)

The groups consisted of "driver"/"filler" teams and a trip leader.  The drivers took the fillers from one pharmacy to another while the fillers went into the pharmacies to fill the prescriptions.  Defendant played the role of trip leader for the trips that he went on.  As leader, defendant created the forged prescriptions using prescription paper and a computer that he brought from Arizona.  Defendant created a number of forged prescriptions for each filler, generally for 180 30-milligram oxycodone pills.  Defendant also provided the fillers with corresponding forged driver's licenses that defendant brought from Arizona.  While the drivers and fillers were out filling prescriptions, defendant monitored police radios on the Internet.  Group participants were all paid once they returned to Arizona, typically based on the number of pills obtained (PSR ¶ 27).

In May 2010, defendant traveled with other coconspirators from Phoenix, Arizona, to Portland, Oregon, to obtain oxycodone from various pharmacies in the District of Oregon by knowingly and intentionally using fraudulent and fake prescriptions.  Specifically, while in the

District of Oregon, defendant's group obtained at least the following amounts of oxycodone using fraudulent prescriptions:

    a.  180 30-milligram tablets from the Safeway Pharmacy in Portland, Oregon, on or about May 22, 2010;

    b.  180 30-milligram tablets from the Rite Aid in Salem, Oregon, on or about May 23, 2010;

    c.  180 30-milligram tablets from the Fred Meyer Pharmacy in Salem, Oregon, on or about May 23, 2010;

    d.  180 30-milligram tablets from the Rite Aid Pharmacy in Gresham, Oregon, on or about May 23, 2010;

    e.  180 30-milligram tablets from a different Rite Aid Pharmacy in Gresham, Oregon on or about May 23, 2010;

    f.  180 30-milligram tablets from the Rite Aid Pharmacy in Beaverton, Oregon, on or about May 24, 2010; and

    g.  180 30-milligram tablets from the Safeway Pharmacy in Beaverton, Oregon, on May 24, 2010.

(PSR ¶¶ 28-29).

In addition, between on or about May 22 and on or about May 24, 2010, while in the District of Oregon, defendant's group used fraudulent prescriptions to attempt to obtain 180 30-milligram oxycodone tablets from at least the following pharmacies: Paulson's Pharmacy in Portland, Oregon, Safeway Pharmacy in Portland, Oregon, and Safeway Pharmacy in Salem, Oregon.

To ensure pharmacies could not contact the "prescribing" physicians to verify the prescriptions, defendant and other members of the group contacted local doctors' offices to determine whether they had an after-hours answering service. Those with no answering service were chosen as the "prescribing" physicians. These physicians' DEA registration numbers were then obtained from a subscription-only website to which coconspirator Roman Avezov had access. (PSR ¶ 25.)

On May 21, 2010, on his way to Oregon to fraudulently obtain oxycodone, defendant was stopped and searched by TSA at the Phoenix, Arizona, airport. In defendant's checked bag officers found $14,000 in U.S. currency, a syringe loaded with an unknown substance and a cellular telephone. The phone's digital content was examined and contained numerous messages involving 21 pharmacies throughout Arizona. Seven calls were made from the phone to Portland physicians' offices. (PSR ¶ 31.)

**Defendant's Criminal History**

Defendant's criminal history reflects very serious felony convictions involving armed robberies and firearms. In 2002 defendant was convicted of armed robbery when he and an accomplice entered a Hollywood Video store with their faces covered, armed with a knife and a firearm. They ordered all of the customers and employees into the back office and ordered an employee to open the safe. (PSR ¶ 49). In 2010 defendant was convicted of solicitation to possess narcotic drugs and misconduct involving weapons. Defendant attempted to fill a fraudulent prescription for oxycodone at a pharmacy in Phoenix. When the police were called, defendant drove away and was later arrested with a .357 revolver and several forged Michigan driver's licenses containing defendant's photo. (PSR ¶ 52). In September of 2011 defendant

was convicted of assault with a deadly weapon when he forced his hands around a corrections officer's neck while carrying a metal shank. Defendant admitted he planned to subdue the officer and escape using a rope he made from three bed sheets in his cell. (PSR ¶ 52a). Also in 2011, defendant was convicted of two counts of robbery of a Walgreen's pharmacy, both involving the defendant displaying a firearm to obtain oxycodone. When arrested by the United States Marshal, defendant possessed large quantities of oxycodone, a wig, and a .44 caliber handgun. (PSR ¶ 52b).

**Role in the Offense**

The government concurs with the Presentence Writer that defendant's role as a leader within the conspiracy qualifies him for a two-level role enhancement pursuant to U.S.S.G. § 3B1.1(c). The facts in the PSR and the facts defendant agreed to in the plea agreement indicate defendant occupied the "second tier" of the four-tier conspiracy and is described as a group leader during trips to obtain narcotics outside of the District of Arizona. As a group leader, defendant directed operations when coconspirator Avezov was not traveling with the group. Defendant created forged prescriptions using prescription paper and a computer he brought from Arizona in addition to monitoring police scanners while others were filling fraudulent prescriptions. (PSR ¶ 35). Under § 3B1.1(c) a two-level upward adjustment is warranted if the defendant is an "organizer, leader, manager, or supervisor in any criminal activity." The Application Notes to 3B1.1(c) provide that a defendant must have overseen "one or more other participants" to qualify for the upward adjustment. A court may impose an enhancement under § 3B1.1(c) if there is evidence that the defendant exercised some control over others involved in the commission of the offense or was responsible for organizing others for the purpose of

carrying out the crime. *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012). The facts set forth in the PSR and the facts admitted by defendant support such an enhancement for defendant's role.

**The Appropriate Sentence in This Case**

The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The guidelines serve as a "lodestone" at sentencing, and "cabin" or "anchor" a sentencing court's discretion. *Peugh v. United States*, ___ U.S. ___, 133 S. Ct. 2072, 2083-84 (2013). While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences." *Id.*

The remaining statutory factors include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. § 3553(a)(1)–(2). They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and where applicable, the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(7). *See also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50 n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow. The court must first correctly determine the applicable guideline range. *Id.* at 991. The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the §3553(a) factors to decide if they support the sentence suggested by the parties." *Id.* The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id.* The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id.* at 991-92.

**Recommended Sentence**

The government requests the Court adopt the findings of the Presentence Report and find that the advisory guideline range is 188 to 235 months as determined by the Probation Officer. A mid-range sentence of 211 months properly addresses the statutory sentencing factors set forth in § 3553(a). It accounts for the nature and seriousness of defendant's criminal conduct—being part of a national drug trafficking organization. It provides a proper measure of punishment, affords adequate deterrence, and promotes respect for the law. It also takes into account

/ / /

/ / /

/ / /

defendant's prior criminal history and characteristics, and protects the public.  The government also requests that the Court impose three years of supervised release.

Dated this 28th day of August 2013.

                                                Respectfully submitted,

                                                S. AMANDA MARSHALL
                                                United States Attorney


                                                *s/ Pamala R. Holsinger*
                                                PAMALA R. HOLSINGER, OSB #89263
                                                Assistant United States Attorney
                                                (503) 727-1000

CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on August 28, 2013, the government's **Sentencing Memorandum** was electronically filed in CM/ECF and was served via the district court's ECF system on the registered users in this case.

 *s/ Pamala R. Holsinger*
PAMALA R. HOLSINGER, OSB #89263
Assistant United States Attorney
